UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| BANK OF AMERICA, N.A.,<br><br>　　　　　　　　Plaintiff,<br>　　v.<br><br>BOULDER RANCH MASTER ASSOCIATION; HOMEOWNER ASSOCIATION SERVICES, INC.; VAL GRIGORIAN; and DIANA ROZENBERG,<br><br>　　　　　　　　Defendants. | Case No. 2:16-cv-01319-GMN-GWF<br><br>**REPORT AND RECOMMENDATION**<br><br>**Re:  Motion to Enforce Settlement Agreement (ECF No. 56)** |

This matter is before the Court on Defendants Val Grigorian and Diana Rozenberg's Motion to Enforce Settlement Agreement and for Attorneys' Fees and Costs (ECF No. 56), filed on February 28, 2018.  Plaintiff filed its Opposition (ECF No. 59) on March 14, 2016, and Defendants Grigorian and Rozenberg filed their Reply (ECF No. 65) on March 23, 2018.  This matter has been referred to the undersigned to make findings and a recommendation.  The Court conducted a hearing on April 2, 2018.  Pursuant to the Court's request, Defendants Grigorian and Rozenberg filed a Supplement (ECF No. 68) to their motion on April 9, 2018, and attached documents from the state court interpleader action.  Plaintiff Bank of America filed its Supplement (ECF No. 71) on April 16, 2018, and Defendant Boulder Ranch filed its Supplement (ECF No. 72) on April 16, 2018.

**BACKGROUND**

This action involves the nonjudicial foreclosure of a homeowners' association assessment lien on residential property on which Plaintiff Bank of America held a first of trust.  Prior to the sale, Bank of America allegedly tendered the super-priority lien amount to the homeowners' association.  Bank of America's tender was allegedly rejected or ignored and the lien foreclosure

sale was conducted on October 9, 2014. Defendants Grigorian and Rozenberg purchased the property for $50,000.00. *Complaint* (ECF No. 1) at ¶¶ 16-29. Defendants asserted that the foreclosure sale extinguished Bank of America's first deed of trust and they owned the property free and clear of that interest. Bank of America filed this action to quiet title and obtain declaratory relief as to the enforceability of the first deed of trust. It alleged that (1) the foreclosure sale violated due process of law and the Supremacy Clause of the United States Constitution, (2) was procedurally improper and commercially unreasonable, and (3) Defendants Grigorian and Rozenberg were not bona fide purchasers for value. *Id.* at ¶¶ 20-58. Bank of America also alleged causes of action for breach of contract and wrongful foreclosure against Defendants Boulder Ranch and Homeowner Association Services. *Id.* at ¶¶ 59-76.

On April 28 and May 5, 2017, the parties participated in a mediation conference. There is no dispute that the parties agreed to the following settlement terms: (1) Bank of America agreed to pay Grigorian and Rozenberg $29,721.15; (2) Boulder Ranch Master Association agreed to pay Grigorian and Rozenberg $2,500.00; (3) Grigorian and Rozenberg would receive the excess funds from the foreclosure sale that Homeowner Association Services, Inc. deposited with the Eighth Judicial District Court for the State of Nevada pursuant to an interpleader action filed in that court; and (4) within 15 business days of Grigorian and Rozenberg's receipt of the payments from Bank of America and Boulder Ranch, they would execute and deliver a quit-claim deed transferring their interest in the residential property to Bank of America. These terms were memorialized in the draft settlement agreements prepared by counsel for Bank of America and Grigorian and Rozenberg. *See Plaintiff's Opposition* (ECF No. 59), *Exhibit 1*; *Defendants' Motion* (ECF No. 56), *Exhibit 2*.

The dispute between the parties concerns who was responsible for obtaining release of the excess funds from the state court interpleader action and having them paid over to Grigorian and Rozenberg. Bank of Nevada was a party to the interpleader action. Grigorian and Rozenberg, and Boulder Ranch were not.

Bank of America's attorney, Karen A. Whelan, states in her declaration that "the subject of the excess funds was central to the settlement talks." *Opposition* (ECF No. 59), *Exhibit A,*

2

*Whelan Declaration*, at ¶ 6. She states, however, that she "was unaware of the mechanism for obtaining the funds, and I made no representations regarding my ability to do so." *Id.* The proposed settlement agreement prepared by Bank of America and delivered to the other parties on or about July 6, 2017 contained the following provision:

> D. **Excess Proceeds.** BANA agrees to submit a disclaimer of interest, attached hereto as Appendix 1, in the **Interpleader** within fifteen business days of the **Effective Date**.

*Opposition* (ECF No. 59), *Whelan Declaration Exhibit 1*.

Ms. Whelan further states that "Attorney Infuso sent an email stating that it was his understanding that the bank would obtain the excess proceeds. In my response and during discussion subsequent, I always maintained I could see what I could do, but never did I represent that I could obtain any of the interpleader funds, or that I would take on doing so." *Whelan Declaration*, at ¶ 7.

Defendants' attorney Michael Infuso states that "[d]uring the May 5, 2017, [sic] I understood that BOA, as a party to the interpleader action, would obtain the excess proceeds from the foreclosure sale which had been deposited with the district court and would pay all of those proceeds to Counterclaimants." *Reply* (ECF No. 65), *Exhibit 1, Infuso Declaration*, at ¶ 4. Mr. Infuso sent an email to Ms. Whelan on June 2, 2017 in which he stated: "Can you please give me an update on the status of obtaining the excess proceeds and settlement agreement?" *Infuso Declaration, Tab A*. Ms. Whelan responded that she was awaiting the HOA file from Boulder Ranch's counsel, Ashlie Surur. She further stated: "Once I have that we will be able to finalize the release." *Infuso Declaration, Tab B*. Ms. Surur advised that she would try to email the HOA file to Ms. Whelan that day. *Infuso Declaration, Tab C*. Ms. Whelan responded: "Thank you, I will forward them as soon as I get them and we will be able to move forward." *Id.*

On July 5, 2017, Ms. Whelan sent an email to Mr. Infuso and Ms. Surur, regarding the settlement agreement in which she stated: "I apologize that the documents were not forwarded sooner. We have received approval for the documents and I will forward them to you later this morning. I just need to get them back from my assistant in final form." *Infuso Declaration, Tab*

3

*D.* Mr. Infuso emailed Ms. Whelan on July 13, 2017 asking whether she had circulated the settlement documents. If they had been circulated, he asked that she re-send them to him. *Id.* Ms. Whelan stated that she would send him another set of documents, which she apparently did. *Id.*

On August 1, 2017, Mr. Infuso sent an email to Ms. Whelan which stated as follows:

> While I am still waiting to hear back from my client, I have an issue with Paragraph 1(D). My understanding of the deal is that the bank is to obtain the excess proceeds (which I thought it was already in the process of doing) and deliver them to me [sic] clients. Remember that my clients are not parties to the interpleader action. I also want to specifically identify the exact amount of the excess proceeds in the agreement. Please remind me of the exact amount of the excess proceeds.

*Infuso Declaration, Tab D.*

Mr. Infuso also referenced paragraph 1(H) of the draft settlement agreement which stated that Defendants would have all tenants vacate the property within ten days after the effective date of the agreement. He stated that this provision might not be possible because there was a tenant in the premises who had a contractual right to stay. *Id.* Ms. Whelan responded by email on August 1, 2017, stating:

> I don't recall the exact amount of the excess proceeds. I remember Ashlie had a figure the day we all met. let me check and see how to accommodate the understanding that were [sic] getting the proceeds. I am not sure we can do this with a tenant that has any length of time. I will check. I don'[t [sic] recall that coming up in discussions.

*Infuso Declaration, Tab E.*

On August 15, 2017, Boulder Ranch's counsel, Ms. Surur, sent an email to Mr. Infuso and Ms. Whelan in which she stated:

> My understanding of the excess proceeds comes from the documents filed in the interpleader action (A-15-713188-C) as my client is not a party to that action. On January 30, 2015, HOA Services filed an interpleader in Clark County, Nevada's Eighth Judicial District Court seeking a court order regarding the distribution of the $41,272.45 in excess proceeds from the foreclosure sale. Vickers, Bank of America and First Light were named as defendants. (See Second Amended Complaint in Interpleader, attached as Exhibit J). A stipulated judgment was reached on May 16, 2016, in which HOA Services received $2,881.60 in attorney's fees and costs and First Light

4

> received $612.00 (See Judgment in Interpleader, attached as Exhibit K). The remaining **$37,778.85** was interplead. The case was then stayed pending a decision from the Nevada Supreme Court regarding calculation of the super-priority lien amount.

*Infuso Declaration, Tab F.*

On August 18, 2017, Mr. Infuso sent an email to Ms. Whelan stating the tenancy would not be an issue. He also inquired: "What are we doing on the excess proceeds? As I previously indicated, we understand the bank would obtain them since it is a party to that case." *Infuso Declaration, Tab F.* Ms. Whelan responded: "I have spoken with out of state counsel. I have to do some work on that." *Id.* Mr. Infuso then stated: "Please explain further. What work needs to be done? I inquire because we need to get this wrapped up and it is going to take time to get court approval for the release of the funds." *Id.* Ms. Whelan replied: "Just that I have to do the paperwork to get the money released. I don't think there is any reason anyone would oppose it." *Id.*

On or about September 27, 2017, Mr. Infuso submitted a revised version of the settlement agreement to counsel for the other parties. Paragraph 1(D) of Grigorian and Rozenberg's revised version stated:

> **Excess Proceeds**. Within fifteen (15) business days of [sic] the following BANA's counsel's receipt of Grigorian and Rozenberg's executed copies of the Agreement along with completed W9 tax forms pursuant to Paragraph 1.A of the Settlement Provisions as set forth above, BANA shall pay Grigorian and Rozenberg the excess proceeds by check made payable to Val Grigorian and Diana Rozenberg in the amount of $37,778.85.

*Motion* (ECF No. 56), *Exhibit 2*.

On September 27, 2017, Ms. Surur sent an email to Mr. Infuso and Ms. Whelan advising that her client was fine with Defendant's revisions to the settlement agreement. *Motion* (ECF No. 56), *Exhibit 3*. Ms. Whelan sent an email in which she stated: "Once I get a clean copy I can get it to the client in final form and seek approval. Still trying to work out how to get the excess funds to Mile's [sic] client." *Id.* In a follow-up email on September 27, 2017, Ms. Surur advised Mr. Infuso that the HOA would have to formally approve the settlement agreement. *Id.*

On October 23, 2017, Mr. Infuso sent an email to Ms. Surur and Ms. Whelan stating that his clients had signed the settlement agreement. He also stated that he had been directed by his clients to file a motion to enforce the settlement. *Id.* Shortly after Mr. Infuso's email was sent, Ms. Surur sent an email stating that she had returned to her office that day. She inquired about the status of the settlement agreement and whether the bank had signed it. Ms. Whelan responded to Ms. Surur's email as follows: "Last I saw was prior to your going out and there was no agreement between us and you on language, Ashlie ..... We didn't sign anything yet and still have a quandary regarding the access to the interpleader funds." *Id.* On November 15, 2017, Mr. Infuso sent an email to Ms. Whelan in which he stated: "What's the status? As time goes on, my client has to incur more expenses in connection with the property, which is decreasing the benefit of the settlement. We have an agreement on all of the material terms. I see no choice but to proceed with a motion to enforce." *Id.* There is no record of further communications between the parties' counsel after November 15, 2017 and the filing of the motion to enforce the settlement agreement on February 28, 2018.

On September 27, 2017, the court in the Nevada interpleader action issued an order to show cause why the stay in that case should not be lifted "and the remaining interpleaded funds should not be considered abandoned pursuant to NRS 120A.530." The court set a hearing for October 24, 2017. The order to show cause was served by email on Bank of America's counsel. *Supplement* (ECF No. 68), *Exhibit 1*. On October 26, 2017, the court entered an order stating that no parties made an appearance in response to the order to show cause. The order stated that (1) the stay was lifted, (2) the $37,778.85 in deposited funds were considered abandoned, (3) the funds were subject to the custody of the State of Nevada pursuant to NRS 120A.530, and (4) the Clerk of Court was to file with the Office of State Treasurer, Unclaimed Property Division, a

1  report of abandoned property pursuant to NRS 120A.560 and NAC 120A.120 et seq.
2  *Supplement* (ECF No. 68), *Exhibit 2*.

3  On November 2, 2017, Bank of America filed a motion for reconsideration of the order
4  deeming the interpleaded funds abandoned. *Supplement* (ECF No. 68), *Exhibit 4*. Bank of
5  America stated that due to an inadvertent error in the calendaring process, the parties failed to
6  appear at the October 24, 2017 order to show cause hearing. It requested that the order of
7  abandonment be set aside and that the parties be permitted to appear and show cause why the
8  funds should be disbursed according to the settlement agreement between the parties. *Id.* at
9  3:19-21. Bank of America further stated that "[d]espite their best efforts to date, a dispute
10 remains as to who is obligated and responsible to obtain the excess proceeds." *Id.* at 5:19-20.
11 The Nevada district court denied Bank of America's motion on December 19, 2017.
12 *Supplement* (ECF No. 68), *Exhibit 3, Order*. The court stated that no party filed a response to the
13 order to show cause. Nor did any party appear for the show cause hearing. *Id.* at 1. The court
14 stated that Bank of America's failure to respond to the order to show cause did not constitute
15 excusable neglect. It also noted that prior to filing the motion for reconsideration, Bank of
16 America did nothing to apprise the court of the related federal action or of the alleged settlement
17 of that action. *Id.* at 2-3.

## DISCUSSION

19 Grigorian and Rozenberg argue that the Court should enforce the settlement agreement
20 allegedly entered into by the parties, and order Bank of America to pay the $29,721.15 that it
21 agreed to contribute to the settlement, plus the $37,778.85 in excess funds that were deposited in
22 the state court interpleader action. Bank of America argues that the parties failed to reach an
23 agreement on a material term, and, therefore, there is no enforceable settlement agreement.

24 It is a well-settled principle that a court has inherent power summarily to enforce a
25 settlement agreement involving an action pending before it. *Dacanay v. Mendoza,* 573 F.2d
26 1075, 1078 (9th Cir.1978); *In re City Equities Anaheim, Ltd.*, 22 F.3d 954, 957 (9th Cir. 1994).
27 The authority of a trial court to enter a judgment enforcing a settlement agreement has as its
28 foundation the policy favoring the amicable adjustment of disputes and the concomitant

7

avoidance of costly and time consuming litigation. *See In re Springpark Assoc.,* 623 F.2d 1377, 1380–81 (9th Cir.1980).

In *May v. Anderson*, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005), the Nevada Supreme Court stated:

> Because a settlement agreement is a contract, its construction and enforcement are governed by principles of contract law. Basic contract principles require, for an enforceable contract, an offer and acceptance, meeting of the minds, and consideration. With respect to contract formation, preliminary negotiations do not constitute a binding contract unless the parties have agreed to all material terms. A valid contract cannot exist when material terms are lacking or are insufficiently certain and definite. A contract can be formed, however, when the parties have agreed to the material terms, even though the contract's exact language is not finalized until later. In the case of a settlement agreement, a court cannot compel compliance when material terms remain uncertain. The court must be able to ascertain what is required of the respective parties.

The Court noted that "[t]he majority of courts have held that the essential terms of a release are necessary to a settlement agreement's formation and that the parties have not reached a settlement when the release terms are still in dispute. However, what is considered an 'essential term' of a release varies with the nature and complexity of the case and must, therefore, be determined on a case-by-case basis." *May*, 121 Nev. at 673, 119 P.3d at 1258.

In this case, the parties agreed in early May 2017 that (1) Bank of America would pay Grigorian and Rozenberg $29,721.15, (2) Boulder Ranch would pay Grigorian and Rozenberg $2,500.00, (3) Grigorian and Rozenberg would receive the $37,778.85 in excess funds from the state court interpleader action, and (4) Grigorian and Rozenberg would quitclaim their interest in the subject residential property to Bank of America. The only uncertain term at that point was which party would be responsible for obtaining release of the $37,778.85 from the interpleader action. Based on the declarations of Mr. Infuso and Ms. Whelan, it does not appear that the parties had agreed on this term at the time of the mediation conference. There was no "meeting of the minds" as to who would obtain release of the interpleaded funds. Ms. Whelan states that she "never represent[ed] that I could obtain any of the interpleaded funds, or that I would take on doing so." *Whelan Declaration*, at ¶ 7. Ms. Whelan never affirmatively stated, however, that Bank of America would not file a motion to obtain the release of the interpleaded funds. Her

8

emails in August 2018 also contradict her assertion that she never agreed to obtain release of the funds from the interpleader action.

On August 1, 2017, Mr. Infuso advised Ms. Whelan that it was his understanding that Bank of America had agreed to obtain the funds from the state court. *Infuso Declaration, Tab D.* Ms. Whelan responded by stating: "let me check and see how to accommodate the understanding that were [sic] getting the proceeds." *Infuso Declaration, Tab E.* On August 18th, Mr. Infuso asked: "What are we doing on the excess proceeds?  As I previously indicated, we understand the bank would obtain them since it is a party to that case." *Infuso Declaration, Tab F.* Ms. Whelan responded: "I have to do some work on that." Mr. Infuso asked her to further explain "[w]hat work needs to be done?" Ms. Whelan thereupon stated: "Just that I have to do the paperwork to get the money released.  I don't think there is any reason anyone would oppose it." *Id.* These email exchanges clearly resulted in a representation by Ms. Whelan that she would take the necessary steps to obtain release of the excess funds from the state court. Thus, as of August 18, 2017, the parties had agreed on all material terms of the settlement agreement, including that Bank of America would obtain release of the interpleaded funds.

Grigorian and Rozenberg also argue that Bank of America should be estopped from denying that it was responsible for obtaining release of the interpleaded funds. They rely on *Goldstein v. Hanna*, 97 Nev. 559, 561-62, 635 P.2d 290, 292 (1981) in which the Nevada Supreme Court stated:

> Where there is a duty to speak, silence can raise an estoppel quite as effectively as can words.  A duty to speak arises when another is or may come under a misapprehension regarding the authority of the principal's agent.  Under such circumstances, the principal is obligated to exercise due care and conduct himself as a reasonably prudent business person with normal regard to the interests of others.

The Court also stated that "silence or failure to repudiate an agent's representations can give rise to an inference of affirmation." *Id.*

In *Mahban v. MGM Grand Hotels, Inc.*, 100 Nev. 593, 596, 691 P.2d 421, 423 (1984), the Court stated that the doctrine of equitable estoppel is generally comprised of the following four elements:

9

> (1) The party to be estopped must be apprised of the true facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has the right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; (4) he must have relied to his detriment on the conduct of the party to be estopped.
>
> *Cheqer, Inc. v. Painters & Decorators,* 98 Nev. 609, 614, 655 P.2d 996, 998–99, (1982). The requirement of actual knowledge of the true facts on the part of the party to be estopped does not apply to a party whose affirmative conduct, consisting of either acts or representations, has misled another. 3 Pomeroy, Equity Jurisprudence § 809 pp. 217–18 (5th ed. 1941).

Based on Ms. Whelan's statements on August 18, 2017, Mr. Infuso reasonably believed that Bank of America would take the necessary action to obtain release of the interpleaded funds. To the extent that the excess funds may no longer be recoverable, Grigorian and Rozenberg relied to their detriment on Bank of America's attorney's representations. The Court is not persuaded, however, that Defendants could not have obtained release of the funds because they were not parties to the state interpleader action. Rule 24(a)(2) of the Nevada Rules of Civil Procedure provides that a person has a right to intervene in an action when it claims an interest relating to the subject of the action and where disposition of the action may as a practical matter impair or impede the person's ability to protect that interest, unless the person's interest is adequately protected by existing parties. Thus, if Bank of America had clearly stated that it would not pursue obtaining release of the funds, Grigorian and Rozenberg could have asserted their right to the funds by filing a motion to intervene in the state court interpleader action. Because they reasonably relied on Bank of America's counsel's representation that she would pursue obtaining release of the funds, however, Grigorian and Rozenberg were not obligated to intervene in the interpleader action. Bank of America is, therefore, responsible for the failure to obtain release of the excess funds before they were declared abandoned by the Nevada district court.

Boulder Ranch and Bank of America argue in their supplemental briefs that Grigorian and Rozenberg can still obtain the excess funds by filing a claim for abandoned property with the Office of the Nevada State Treasurer. If the excess funds can still be recovered, then Grigorian

1 and Rozenberg should take any necessary action to obtain them. If the excess funds are not
2 recoverable, however, then Bank of America should indemnify Grigorian and Rozenberg for
3 their loss.

4       Grigorian and Rozenberg argue that they should be awarded their attorneys' fees for
5 having to bring the motion to enforce the settlement agreement. They base their fee request on
6 28 U.S.C. § 1927 which provides that attorney's fees may be awarded against an attorney "who
7 so multiplies the proceedings in any case unreasonably and vexatiously." Under § 1927,
8 attorney's fees may be recovered against the attorney, but not against the party. *Schutts v.*
9 *Bentley Nevada Corp.*, 966 F.Supp. 1549, 1558 (D.Nev. 1997); *Geraldo v. Richland Holdings,*
10 *Inc.*, 2018 WL 1567847, at *2 (D.Nev. March 30, 2018). An award of attorney's fees as a
11 sanctions under § 1927 requires a finding or recklessness or bad faith by the attorney. *B.K.B. v.*
12 *Maui Police Dept.*, 276 F.3d 1091, 1107 (9th Cir. 2002). The court also stated that "'section
13 1927 sanctions must be supported by a finding of subjective bad faith,' which 'is present when
14 an attorney knowingly or recklessly raises a *frivolous* argument, or argues a meritorious claim
15 for the purpose of harassing an opponent.'" *Id.* (citing *In re Keegan Mgmt. Co. Sec. Lit.*, 78 F.3d
16 431, 436 (9th Cir. 1996)). There was a reasonable disagreement between the parties following
17 the mediation as to who was responsible for obtaining release of the funds in the interpleader
18 action. Although the Court finds that Bank of America was ultimately responsible for obtaining
19 release of the funds based on its attorneys' representations, the attorney's conduct in failing to
20 timely pursue recovery of the funds from the interpleader action, or in opposing the motion to
21 enforce the settlement agreement, does not rise to the level of recklessness or bad faith. Plaintiff
22 is not entitled to an award of fees under § 1927. Accordingly,

23 . . .

24 . . .

25

26

27

28

11

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Defendants Val Grigorian and Diana Rozenberg's Motion to Enforce Settlement Agreement and for Attorneys' Fees and Costs (ECF No. 56) be **granted** as follows:

1. Bank of America shall pay Grigorian and Rozenberg $29,721.15;

2. Boulder Ranch Master Association shall pay Grigorian and Rozenberg the sum of $2,500.00;

3. Within 15 business days of Grigorian and Rozenberg's receipt of the payments from Bank of America and Boulder Ranch, they shall execute and deliver a quit-claim deed of their right, title and interest in the residential property to Bank of America.

4. Grigorian and Rozenberg and Bank of America shall take all required steps to recover the $37,778.85 in abandoned funds from the Office of the Nevada State Treasurer. If the funds are no longer recoverable because of Bank of America's failure to pursue their release from the interpleader action, then it shall pay the additional $37,778.85 to Grigorian and Rozenberg.

5. The parties shall file a status report within sixty (60) days after an order adopting and approving this recommendation regarding their efforts to obtain the abandoned funds from the Office of the Nevada State Treasurer.

DATED this 18th day of April, 2018.

GEORGE FOLEY, JR.
UNITED STATES MAGISTRATE JUDGE